## Case No. 3,458.

### The CUBA.

[3 Ware, 260.][1]

District Court, D. Maine. May Term, 1860.

FREIGHT—NON-DELIVERY—DANGERS OF THE SEAS —SPECIAL CONTRACT.

1. By the general maritime law, the contract for freight is an entirety, and includes both carriage and delivery.

2. The exception, dangers of the seas, excuses the master for a non-delivery, but does not authorize a demand of freight.

3. By a special contract, by which the amount of freight was made to depend on the gross gauge of the casks delivered, it is immaterial how the loss was occasioned, whether by ordinary leakage or the dangers of the seas.

Shepley & Dana, for libellants.
Mr. Rand, for respondents.

WARE, District Judge. By the charter-party, dated February 23d, 1860, the brig was to proceed to Portland, and there, at the expense of the charterers, to take in a cargo or ballast and thence proceed for Matanzas or one other port on the north side of the island of Cuba, and there receive a full return cargo of molasses, "both under and upon deck," for her port of discharge in the United States, north of Cape Hatteras, and not east of Portland. The charterers were to pay all port charges, to advance what

[1] [Reported by Hon. Ashur Ware, District Judge.]

should be necessary for her disbursements at Cuba, and pay $3.62½ per hogshead "of 110 gallons gross gauge of the casks delivered, which is to be in full of the voyage out and back." The brig proceeded on her voyage successfully, received her cargo at Portland, and delivered it at Matanzas, there took in a full cargo of molasses, both on and under deck. But on her return to the United States, she encountered a violent gale, and for the safety of the vessel, and the lives of all on board, she was obliged to sacrifice her deck load, consisting of 60 hogsheads of molasses. These were voluntarily stove by the crew, and the contents allowed to escape into the water, they cutting the hoops at one end, and breaking the heading. Of these casks, 56 were brought to her port of discharge at Portland, and four were lost overboard. The violence of the storm was such that 26 of the casks under deck lost either the whole or part of their contents, and were found by the custom-house gaugers to be empty. The parties not being able to agree on the amount of freight due, this libel is brought, claiming freight on all the casks brought home, according to their gross gauge. The respondents resist this claim, but offer freight for all the molasses actually delivered.

It is clear that by the general maritime law, freight, whether by charter-party or bill of lading, is due only for articles delivered. The contract, though it consists of two parts, is necessarily one, unless otherwise provided. It is both to convey and deliver, and is not completed until the delivery. It may be agreed that freight shall be paid on all the goods received on board, as is frequently done in the case of live stock, which is much exposed in the transportation; but, unless the parties otherwise agree, freight is due only for that which is delivered, or for which there is a lawful excuse for non-delivery. 3 Kent, Comm. 225, 226; 1 Pars. Mar. Law, 142–219. If casks or boxes in which goods have been packed arrive empty, or nearly so, so that the goods are not worth the freight, though it was formerly a much disputed question, it is now settled that they cannot be abandoned by the shipper for freight, when this is by ordinary leakage or the natural vice of the articles. 3 Kent, Comm. 324; 1 Valin, Comm. 670; Poth. Chart. No. 57; Abb. Shipp. (Am. Ed.) 433–435. But if lost not by ordinary leakage, but by the dangers of the seas, no freight is due. This will excuse the carrier from paying the price of the goods, but not from a delivery. In the case of ordinary leakage, the carrier has performed his contract, so far as depended on him; in the latter his contract is to carry and deliver the goods, the dangers of the seas excepted, and as he is prevented from a delivery by these dangers, his freight is not earned.

In this case, it is not disputed that the molasses was lost by the violence of the ele-

.ments, and the qu 'cn is, whether the special terms of the contract control the general law, for that governs unless excepted by the contract. This is a libel, not on a bill of lading, but a charter-party. The vessel at the time of the charter was lying at Boston, and by its terms she was to proceed to Portland and take in cargo or ballast, and thence to proceed to Matanzas or one other port on the north shore of the island of Cuba, and there receive a full return cargo of molasses, both under and upon deck, for her port of discharge in the United States. The whole compensation was to be dependent on her return cargo; for she was to receive nothing for that bound outward. The master stipulated for a full cargo. No question has been made but that a full cargo was received. The amount of this for which freight was to be paid might be ascertained by the amount received at the port of lading, or delivered at the port of discharge. But the parties to this contract have adopted neither. But $3.02½ were to be paid for the casks, delivered, gross gauge of the casks, and 110 gallons of this gross gauge was equivalent to a hogshead. The counsel for the defence contends that those casks only were to be measured from which no more liquors were lost than what might be considered as the usual leakage, and not what was occasioned by the dangers of the seas. But the contract contains no words limiting the freight in that way. They are casks delivered, whether they contain much or little, or none at all, and whether the leakage was occasioned by the dangers of the seas or not. And we are not at liberty unnecessarily to introduce words, which the parties have not seen fit to use, when these are free from ambiguity and have a plain sense by themselves. If these show a contract, not prohibited by law, they are binding on the parties according to their ordinary meaning. As the whole freight of this vessel was to be paid on her return cargo, and she was to have nothing for her outward trip, it was natural that this should be stipulated on the most advantageous terms. Such, we are entitled to presume, was the common intention. I can see no reason why freight should not be allowed on the twenty-six casks which arrived below deck. For the four on deck, which were lost overboard, no freight is claimed. The fifty-six came in a dilapidated state. They were not measured by the custom-house gauger, but were by Mr. McAllister, the city gauger. According to his account the hoops were cut at one end and the heading stove, so that they could not be gauged with perfect accuracy. He gauged the capacity of the hogsheads as near as he could, and for the residue he made an estimate. It is contended that these were delivered in such a state as not to entitle them to be measured as empty casks. This must be determined by the terms of the special contract. The words of the charter-party are "casks delivered." The object of

the parties could not be the casks themselves, for these could be of very little value. The object of the shipper undoubtedly was the contents of the casks, and casks are referred to merely to determine the quantity of molasses. That was to be ascertained by the gross measure of the casks, and the shipper took on himself the risk of loss, by whatever cause it might be, by the dangers of the seas, unavoidable accident or ordinary leakage. Though they could not be gauged with perfect accuracy, they could be nearly so, and I think sufficiently so to entitle the master to his freight under this contract; for, it is to be recollected, that the master's whole compensation was to be on the return cargo. Commercial contracts are to receive a reasonable, not a technical construction. This is more consonant to the minds of merchants, and an exact technical meaning of words is not to be given to them, unless that was clearly intended.